UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| HARVEY HORWITZ, Derivatively on Behalf of QUORUM HEALTH CORPORATION, | ) ) ) | Case. No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| THOMAS D. MILLER, MICHAEL J. CULOTTA, BARBARA R. PAUL, R. LAWRENCE VAN HORN, WILLIAM S. HUSSEY, JAMES T. BREEDLOVE, WILLIAM M. GRACEY, JOSEPH A. HASTINGS, and ADAM FEINSTEIN, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| -and- | ) ) | |
| QUORUM HEALTH CORPORATION, a Delaware corporation, | ) ) ) ) | |
| Nominal Defendant. | ) ) | DEMAND FOR JURY TRIAL |

**[REDACTED] VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation by plaintiff's counsel, which included, among other things, a review of: (i) documents and other information obtained from Quorum Health Corporation ("Quorum" or the "Company") pursuant to title 8 section 220 of the Delaware General Corporation Law Code (the "Books and Records Production"); (ii) the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); and (iii) news reports, press

- 1 -

releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Quorum against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Quorum's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Quorum is an independent operator and manager of general acute-care hospitals and outpatient services in the United States.  The Company came into existence when Community Health Systems, Inc. ("CHS"), one of the nation's largest operators of general acute care hospitals, spun it off in April 2016.  The spin-off, effective April 29, 2016, consisted of thirty-eight rural community hospitals in sixteen states and Quorum Health Resources LLC, a provider of management and consulting services.  On May 2, 2016, Quorum stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "QHC."

3.      On April 1, 2016, Quorum filed a Form 10-12B/A ("Form 10"), in connection with the impending spin-off from CHS.  According to the Form 10, the Company's assets included $876 million in property plant and equipment and $541.7 million in goodwill,[1] $508.4 million of which was attributable to Quorum's hospital reporting unit.   When the Form 10 was filed, Quorum was a wholly owned subsidiary of CHS.  The Form 10 itself states that "[a]ll of the outstanding shares of Quorum Health Corporation common stock are currently owned by CHS."  In Quorum's Quarterly Report for the first quarter ended March 31, 2016, filed with the

---

[1] As explained herein, CHS allocated Quorum's goodwill as a portion of its own goodwill.

SEC on May 11, 2016, after it became an independently traded company, Quorum reported substantially similar values to those in the Form 10.

4.      Unfortunately, as would later be revealed, Quorum's assets were impaired by hundreds of millions of dollars as of the date of the spin-off, and as a result, these financial statements significantly overstated the value of the Company's assets and artificially inflated Quorum's stock.  The Individual Defendants (as defined herein) improperly postponed testing the Company's goodwill and long-lived assets for impairment to delay addressing hundreds of millions of dollars of losses.  They did so despite knowledge of, or at least reckless disregard for obvious red flags, including:  (i) a sustained decrease in stock prices (and corresponding decline in market capitalization) for CHS and Quorum; (ii) declining financial performance for both CHS and Quorum; (iii) Quorum's underperforming hospitals; (iv) mounting industry-wide negative trends in the hospital management industry; and (v) increasing competition from larger hospitals.

5.      ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  *See* QHC-220-000634.[2]  Quorum's Board of Directors (the "Board") failed to address these deficiencies despite actual or constructive knowledge of the Company's lack of internal controls.

6.      The truth about the Company's financial condition and lack of internal controls began to emerge on August 10, 2016, when Quorum filed its Quarterly Report on Form 10-Q with the SEC, announcing its financial results for the quarter ended June 30, 2016 (the "Q2 2016

---

[2] All references to "QHC-220-_____" are from the Books and Records Production produced in response to plaintiff's inspection demand pursuant to title 8 section 220 of the Delaware General Corporation Law Code on Quorum (the "Section 220 Demand").  A copy of the Section 220 Demand is attached hereto as Exhibit A and incorporated herein by reference.

Form 10-Q"). The Q2 2016 Form 10-Q revealed noncash impairment charges of $250.4 million for the quarter, which included $200 million related to the carryover allocation of goodwill at the time of the Quorum spin-off, $45.4 million to reduce certain long-lived asset values, and $5 million in goodwill based on management's decision to divest certain hospitals.

7. As a result of Quorum's underperforming hospitals, increasing operating costs, and impairment of goodwill, the Company reported a substantial operating loss of $259.3 million, compared to the $27.5 million of operating income the Company reported for the same period in the prior year. In its press release issued the same day, the Company also announced that it lowered its 2016 guidance for net operating revenues to range from $2.15 billion to $2.20 billion from its previous range of $2.2 billion to $2.3 billion.

8. Not surprisingly, the day after the Company published the disappointing and unexpected financial results, shares of Quorum stock plummeted nearly 50%, from $10.02 per share on August 10, 2016 to $5.03 per share on August 11, 2016, instantly wiping out more than $147 million in market capitalization.

9. Further, as a direct result of this unlawful course of conduct, the Company is now the subject of both federal and state securities class action lawsuits (collectively, the "Securities Class Actions"). The federal securities class action, filed in the U.S. District Court for the Middle District of Tennessee on behalf of investors who acquired Quorum's shares, brings claims against Quorum and defendants Thomas D. Miller ("Miller") and Michael J. Culotta ("Culotta") in connection with the Company's improper statements, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). The second amended complaint alleges that the goodwill and long-lived assets of Quorum were impaired on the date of the spin-off, but Quorum and CHS failed to disclose these impairments.

On April 20, 2018, Chief Judge Waverly D. Crenshaw denied the defendants' motion to dismiss this lawsuit. In doing so, Judge Crenshaw found that the plaintiffs "ha[d] sufficiently alleged, given the underlying 'red flags,' that the decisions not to test for impairments and not to take those impairments in 1Q 2016 were fraudulent." Judge Crenshaw further stated: "Plaintiffs have sufficiently alleged that Defendants' assurances (by their failures to test and take additional impairments) did not 'fairly align with the information in [Defendants'] possession at the time.'"

10.     The state securities class action, filed in the Circuit Court of Williamson County, Tennessee, brings similar claims against Quorum and defendants Miller and Culotta under Tennessee's blue sky laws. On May 11, 2018, Judge Joseph A. Woodruff denied the defendants' motion to dismiss this lawsuit. The Company will now be forced to bear the cost of investigating, defending, and potentially settling or paying an adverse judgment in the Securities Class Actions.

11.     Quorum and its fiduciaries, however, are not the only parties responsible for the substantial damages Quorum has incurred, and continues to incur as a result of the wrongdoing detailed herein. As explained further herein, certain of CHS's current and former directors are responsible for failing to test and account for impairments to the goodwill and long-lived assets of Quorum in a timely manner, despite numerous indicators of impairment prior to the spin-off of Quorum. By failing to write down CHS's goodwill and long-lived assets before spinning off Quorum, CHS deceived Quorum's investors as to the true value of the Company.

12.     As part of the spin-off of Quorum, but before it actually occurred, the Company and CHS entered into a Separation and Distribution Agreement (the "Separation Agreement") detailing the assets and liabilities Quorum would receive from CHS. The Separation Agreement released from liability:

[A]ll Persons who at any time are or have been shareholders, directors, officers, agents or employees of CHS or a CHS Subsidiary … from:  (i) all QHC Liabilities; and (ii) any other Liabilities existing or arising:  (A) in connection with the implementation of the Separation and the Distribution; or (B) from actions, inactions, events, omissions, conditions, facts or circumstances occurring or existing prior to the Effective Time … to the extent relating to, arising out of or resulting from the QHC Business, the QHC Assets or the QHC Liabilities.

13.     Thus, the Separation Agreement contained a release for all of CHS's directors and officers from any liability for the wrongdoing they caused, including defendants Culotta, Miller, William S. Hussey ("Hussey"), and Barbara R. Paul ("Paul").   In turn, the costs of this wrongdoing now sit squarely with Quorum, as the Separation Agreement prevents recourse against CHS's directors for breaching their fiduciary duties of loyalty in connection with the spin-off.  In giving up these valuable claims for no consideration, defendants Culotta and Miller breached their fiduciary duties.

14.     Furthermore, ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. *See* QHC-220-000002-4.   In making or approving these false and misleading statements, these defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5.  For the foregoing reasons, the Separation Agreement is voidable under section 29(b) of the Exchange Act to the extent it releases CHS and its officers, directors, and employees (including defendants Culotta, Miller, Hussey, and Paul) from any liability arising in connection with the spin-off.

15.     Accordingly, plaintiff now brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

16.    Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs. Further, pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of section 29 (b) of the Exchange Act. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

17.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Quorum, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

19.    Plaintiff Harvey Horwitz was a CHS stockholder before the spin-off and received Quorum stock as a result of the spin-off. Plaintiff was a stockholder of Quorum at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a

current Quorum stockholder. In May 2018, plaintiff made a Section 220 Demand on Quorum and subsequently received access to the Books and Records Production. Plaintiff is a citizen of New Mexico.

**Nominal Defendant**

20. Nominal defendant Quorum is a Delaware corporation with principal executive offices located at 1573 Mallory Lane Brentwood, Tennessee. Accordingly, Quorum is a citizen of Delaware and Tennessee. Quorum is an independent operator and manager of general hospitals and outpatient services in the United States, with facilities in fifteen states. Quorum provides its services through its hospitals and affiliated facilities, including urgent care centers, diagnostic and imaging centers, physician clinics, and surgery centers. The Company's wholly owned subsidiary, Quorum Health Resources LLC, provides management advisory and consulting services to nonaffiliated hospitals located throughout the United States. Quorum was spun off from parent company, CHS effective April 29, 2016. As of December 31, 2017, Quorum had approximately 13,000 employees.

**Defendants**

21. Defendant Miller is a consultant to Quorum and has been since May 2018. Defendant Miller was also Quorum's Chief Executive Officer and a director from April 2016 to May 2018. In addition, defendant Miller was CHS's President of Division V Operations from July 2007 to at least April 2016. Defendant Miller is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and Tennessee's blue sky laws. Defendant Miller knowingly, recklessly, or with gross negligence: (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and

financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning: (a) the accrual of hundreds of millions of dollars in unreported impairment charges for Quorum; (b) the adequacy of the Company's internal controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct. In addition, defendant Miller knowingly, recklessly, or with gross negligence approved the Separation Agreement which deprived Quorum of a substantial asset, Quorum's claims against CHS and certain of its officers and directors, including defendant Miller. Quorum paid defendant Miller the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|-------------------------|------------------------|-------|
| 2016 | $829,529 | $150,000 | $3,535,469 | $0 | $370,945 | $30,145 | $4,916,088 |
| 2015 | $675,000 | $13,500 | $1,698,200 | $108,000 | $348,758 | $18,290 | $2,861,748 |
| 2014 | $650,000 | $50,000 | $1,452,850 | $614,250 | $332,149 | $21,952 | $3,121,201 |

Defendant Miller is a citizen of Tennessee.

22. Defendant Culotta is a consultant to Quorum and has been since April 2018. Defendant Culotta was Quorum's Executive Vice President and Chief Financial Officer from April 2016 to March 2018. In addition, defendant Culotta was CHS's Vice President of Investor Relations from 2013 to at least October 2015. Defendant Culotta is named as a defendant in the related Securities Class Actions that allege he violated sections 10(b) and 20(a) of the Exchange Act and Tennessee's blue sky laws. Defendant Culotta knowingly, recklessly, or with gross negligence: (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning: (a) the accrual of hundreds of millions of dollars in unreported impairment charges for Quorum; (b) the adequacy of the Company's internal

controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct. In addition, defendant Culotta knowingly, recklessly, or with gross negligence approved the Separation Agreement which deprived Quorum of a substantial asset, Quorum's claims against CHS and certain of its officers and directors, including defendant Culotta. Quorum paid defendant Culotta the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $510,017 | $0 | $1,016,545 | $0 | $24,271 | $1,550,833 |
| 2015 | $315,000 | $50,000 | $291,120 | $31,501 | $20,511 | $708,132 |
| 2014 | $300,000 | $15,000 | $124,530 | $165,000 | $47,852 | $652,382 |

Defendant Culotta is a citizen of Tennessee.

23. Defendant Paul is a Quorum director and has been since April 2016. Defendant Paul is also CHS's Senior Medical Advisor and has been since at least November 2015 and was CHS's Senior Vice President and Chief Medical Officer from 2007 to 2014. Defendant Paul knowingly or recklessly: (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning: (a) the accrual of hundreds of millions of dollars in unreported impairment charges for Quorum; (b) the adequacy of the Company's internal controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct. Quorum paid defendant Paul the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|-------------|-------------------|--------------|-------|
| 2016 | $90,000 | $127,700 | $217,700 |

Defendant Paul is a citizen of California.

24.    Defendant Van Horn is a Quorum director and has been since April 2016. Defendant Van Horn is also a member of Quorum's Audit and Compliance Committee and has been since April 2016.  Defendant Van Horn knowingly or recklessly:  (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning: (a) the accrual of hundreds of millions of dollars in unreported impairment charges for Quorum; (b) the adequacy of the Company's internal controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct.  Quorum paid defendant Van Horn the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $105,000 | $127,700 | $232,700 |

Defendant Van Horn is a citizen of Tennessee.

25.    Defendant Hussey was a Quorum director from April 2016 to April 2018. Defendant Hussey was also CHS's Division President—Division VI Operations from at least April 2014 to December 2015; Division President—Division IV Operations from 2007 to at least April 2013; Group Senior Vice President from January 2004 to 2007; Group Vice President from January 2003 to January 2004; and Group Assistant Vice President from June 2001 to January 2003.  Defendant Hussey knowingly or recklessly:  (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; and (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting.  Quorum paid defendant Hussey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $90,000 | $127,700 | $217,700 |

Defendant Hussey is a citizen of Tennessee.

26.     Defendant Breedlove is a Quorum director and has been since April 2016. Defendant Breedlove is also Chairman of Quorum's Governance and Nominating Committee; a member of that committee; and a member of the Audit and Compliance Committee and has been since April 2016.   Defendant Breedlove knowingly or recklessly:   (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning: (a) the accrual of hundreds of millions of dollars in unreported impairment charges for Quorum; (b) the adequacy of the Company's internal controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct.   Quorum paid defendant Breedlove the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $100,000 | $127,700 | $227,700 |

Defendant Breedlove is a citizen of either Pennsylvania or Connecticut.

27.     Defendant Gracey was Quorum's Chairman of the Board and a director from April 2016 to March 2018.  Defendant Gracey was also a member of Quorum's Governance and Nominating Committee from April 2016 to March 2018.   Defendant Gracey knowingly or recklessly:   (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning:  (a) the accrual of hundreds of millions of dollars in

unreported impairment charges for Quorum; (b) the adequacy of the Company's internal controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct. Quorum paid defendant Gracey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $165,000 | $127,700 | $292,700 |

Defendant Gracey is a citizen of Tennessee.

28. Defendant Hastings is a Quorum director and has been since April 2016. Defendant Hastings is also a member of Quorum's Governance and Nominating Committee and has been since April 2016. Defendant Hastings knowingly or recklessly: (i) failed to conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning: (a) the accrual of hundreds of millions of dollars in unreported impairment charges for Quorum; (b) the adequacy of the Company's internal controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct. Quorum paid defendant Hastings the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $90,000 | $127,700 | $217,700 |

Defendant Hastings is a citizen of Alabama.

29. Defendant Feinstein was a Quorum director from April 2016 to September 2017. Defendant Feinstein was also Chairman of Quorum's Audit and Compliance Committee; a member of that committee; and a member of the Governance and Nominating Committee from April 2016 to September 2017. Defendant Feinstein knowingly or recklessly: (i) failed to

conduct impairment testing in a timely manner despite indicators of impairment; (ii) caused or allowed Quorum to operate with inadequate internal controls over accounting and financial reporting; and (iii) made improper statements in the Company's press releases and public filings concerning: (a) the accrual of hundreds of millions of dollars in unreported impairment charges for Quorum; (b) the adequacy of the Company's internal controls; and (c) the Company's artificially overstated value as a result of defendants' wrongful conduct. Quorum paid defendant Feinstein the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $110,000 | $127,700 | $237,700 |

Defendant Feinstein is a citizen of New York.

30. The defendants identified in ¶¶21-22 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶21, 23-29 are referred to herein as the "Director Defendants." The defendants identified in ¶¶24, 26, 29 are referred to herein as the "Audit and Compliance Committee Defendants." Collectively, the defendants identified in ¶¶21-29 are referred to herein as the "Individual Defendants."

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Fiduciary Duties**

31. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Quorum and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Quorum in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Quorum and not in furtherance of their personal interest or benefit.

32. To discharge their duties, the officers and directors of Quorum were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Quorum were required to, among other things:

(a) ensure that the Company operated with adequate internal controls over financial reporting;

(b) ensure that the Company operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(c) ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive conduct;

(d) ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management, including having a working and functioning accounting department;

(e) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(f) remain informed as to how Quorum conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(g)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Additional Duties of the Audit and Compliance Committee Defendants**

33.     Under the Quorum Board's Audit and Compliance Committee Charter, the Audit and Compliance Committee Defendants, defendants Breedlove, Feinstein, and Van Horn, owe and/or owed specific additional duties to Quorum.  According to the Audit and Compliance Committee Charter, among other things, the Audit and Compliance Committee is responsible for assisting the Board in overseeing:  (i) "the integrity of the Company's financial statements"; (ii) "the Company's compliance with legal and regulatory requirements"; (iii) "the Independent Accountant's qualifications and independence"; and (iv) "the performance of the Company's internal audit function and Independent Accountant."  In overseeing the integrity of the Company's financial statements, the Audit and Compliance Committee is specifically required to "[o]btain and review reports from Management assessing the effectiveness of the Company's internal control structure and procedures for financial reporting."  In addition, the Audit and Compliance Committee is required to:

> 1. Appoint the Independent Accountant (subject to ratification by the stockholders), evaluate the Independent Accountant, approve all audit engagement fees and terms, as well as all non-audit engagements with the Independent Accountant, and review and approve any discharge of the Independent Accountant. The Committee may delegate to one or more Committee members the authority to pre-approve such non-audit services between regularly scheduled meetings provided that such approvals are reported to the full Committee at the next Committee meeting.
>
> 2. At least annually, obtain and review a report by the Independent Accountant describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues,

and (to assess the Independent Accountant's independence) all relationships between the Independent Accountant and the Company.

3. Discuss with the Independent Accountant the quality of the Company's financial accounting personnel, and any relevant recommendations that the Independent Accountant may have.

\* \* \*

9. Review with the Chief Financial Officer, the Controller, the Corporate Compliance Officer, the Independent Accountant, and the senior officer for Internal Audit, the Company's policies and procedures, as appropriate, to reasonably assess the adequacy of internal accounting and financial reporting controls and compliance practices and procedures.

\* \* \*

12. Review with the Chief Financial Officer, the Controller, the Corporate Compliance Officer, the senior officer for Internal Audit and the Independent Accountant, annual audited financial statements and quarterly financial statements, including the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operation" prior to their release to the public. Discuss with the Independent Accountant the matters required to be discussed by the Statement on Auditing Standards No. 61 relating to the conduct of the year-end audit.

13. Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies prior to their public release.

\* \* \*

24. Obtain and review a report from the Independent Accountant regarding (1) all critical accounting policies and practices to be used, (2) all alternative treatments of financial information within [generally accepted accounting principles ("GAAP")] that have been discussed with management and the ramifications of the use of such alternative disclosures and treatments, (3) the treatment preferred by the Independent Accountant, and (4) other written communications such as any management letters or schedule of unadjusted differences.

25. Obtain and review reports from Management assessing the effectiveness of the Company's internal control structure and procedures for financial reporting, including (1) all significant deficiencies or material weaknesses in the design or operation of internal controls, (2) any fraud, whether or not material, that involves Management or other employees having a significant role in the internal controls, and (3) all significant changes to internal controls, including corrective actions, since the last report to the Committee.

**Breaches of Duties**

34.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Quorum, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

35.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial condition and compliance policies.  The Individual Defendants further failed to implement adequate internal controls to ensure the Company's compliance with statutory accounting regulations and SEC rules and regulations.  These improper practices wasted the Company's assets, and caused Quorum to incur substantial damage.

36.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Quorum, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.

37.     In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Actions that allege violations of federal and state securities laws.  As a result, and in addition to the damage the Company has already incurred, Quorum has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Quorum, regarding the Individual Defendants' management of Quorum's operations, the Company's financial condition, and the adequacy of the Company's internal controls over financial reporting; and (ii) enhance the Individual Defendants' executive and directorial positions at Quorum and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

41. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements and mislead the investing public regarding the Company's financial

performance. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## THE RELATIONSHIP BETWEEN QUORUM AND CHS

44. CHS is one of the nation's largest operators of general acute care hospitals. Its affiliates own, operate, or lease 125 hospitals in nineteen states with approximately 20,850 licensed beds. In August 2015, CHS announced plans to form a new, independent, publicly-traded hospital company by spinning off a group of thirty-eight hospitals and Quorum Health Resources LLC, a hospital management and consulting firm. The new company, Quorum, was incorporated on July 27, 2015.

45. On April 1, 2016, CHS's board of directors approved the separation of Quorum from CHS and declared a special dividend distribution of all outstanding shares of Quorum common stock. The terms of the separation are memorialized in the Separation Agreement. Defendant Culotta signed the Separation Agreement on behalf of Quorum and W. Larry Cash signed on behalf of CHS, as the Company's Chief Financial Officer.

46. On April 29, 2016, CHS made a pro rata distribution of 100% of the outstanding common stock of Quorum to CHS's stockholders of record as of the close of business on April

22, 2016. CHS stockholders received one share of Quorum common stock for every four shares of CHS common stock held as of April 22, 2016, plus cash in lieu of any fractional shares. Quorum then became a public company trading on the NYSE under the symbol "QHC."

47.     Quorum now operates as an independent operator and manager of general acute-care hospitals and outpatient services in the United States.

**DEFENDANTS CULOTTA AND MILLER RELEASE CHS, THEMSELVES, AND DEFENDANTS HUSSEY AND PAUL FROM LIABILITY FOR WRONGDOING**

48.     As part of the separation, Quorum and CHS entered into the Separation Agreement specifying which assets and liabilities would transfer to Quorum. The Separation Agreement provides that it is "intended to result in QHC owning the QHC Assets and assuming the QHC Liabilities…."

49.     As part of the Separation Agreement, Quorum released CHS's board of directors, executives, and employees from any liability relating to any of the assets and liabilities that were transferred from CHS. Specifically, section 4.01 of the Separation Agreement titled "Releases" states:

> QHC does hereby … remise, release and forever discharge … (2) all Persons who at any time are or have been shareholders, directors, officers, agents or employees of CHS or a CHS Subsidiary … from: …     (i) all QHC Liabilities; and (ii) any other Liabilities existing or arising:  (A) in connection with the implementation of the Separation and the Distribution; or (B) from actions, inactions, events, omissions, conditions, facts or circumstances occurring or existing prior to the Effective Time … to the extent relating to, arising out of or resulting from the QHC Business, the QHC Assets or the QHC Liabilities" [(the "Release")].

50.     The Release precludes Quorum from recovering from CHS, CHS's directors, or any of CHS's employees, for the damages incurred to the Company as a result of their actions prior to Quorum's separation from CHS. In fact, Quorum is precluded from seeking relief even if the Quorum Assets continue to harm the Company because of these bad acts. Further, and of particular importance, Quorum received no consideration for giving up these valuable claims.

51. Certain of CHS's current and former directors and officers are responsible for failing to test and account for impairments to the goodwill and long-lived assets of Quorum in a timely manner, despite numerous indicators of impairment prior to the spin-off of Quorum. By not recording goodwill and long-lived asset impairments on a timely basis, Quorum's assets were materially overstated in its first quarter 2016 financial statements. As a result, the Company was forced to record a $250.4 million impairment charge during the second quarter of 2016 and report a substantial net loss for the quarter. Unfortunately, however, the Separation Agreement prevents Quorum from holding CHS and its fiduciaries responsible for their misconduct and the resulting harm caused to the Company.

52. By entering into the Release, defendants Culotta and Miller prevented Quorum from ever seeking contribution from CHS for these losses and the costs incurred in defending Quorum in litigation arising from the undisclosed impairments. Accordingly, these defendants deprived Quorum of a substantial asset, Quorum's claims against CHS and certain of its officers and directors. At the same time, defendants Culotta and Miller benefited from the contract by releasing themselves from liability for any wrongdoing arising in connection with the spin-off of Quorum. As executives of CHS, defendants Hussey and Paul also received this benefit. In negotiating and approving the aforementioned Release, defendants Culotta and Miller breached their fiduciary duties to Quorum.

53. Finally, while negotiating and implementing this contract, the Individual Defendants disseminated or approved false and misleading public statements about Quorum. These false and misleading statements concerned the value of Quorum's assets at the time of the spin-off and were made in executing the transfer of assets from CHS to Quorum as provided by the Separation Agreement. In making or approving these false and misleading statements, the

Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5. For the foregoing reasons, the Separation Agreement is voidable under section 29(b) of the Exchange Act to the extent it releases CHS and its officers, directors, and employees (including defendants Culotta, Miller, Hussey, and Paul) from any liability arising in connection with the spin-off.

### THE BOARD FAILED TO TIMELY TEST THE COMPANY'S GOODWILL AND LONG-LIVED ASSETS FOR IMPAIRMENT IN VIOLATION OF GAAP AND SEC REGULATIONS

**A.    Quorum's Valuation at the Time of the Spin-Off and Subsequent Improper Statements**

54.    On April 1, 2016, the Company filed its Form 10 with the SEC in connection with the spin-off of Quorum from CHS.[3]  The Form 10 stated that the Company's assets included $876 million in property plant and equipment and $541.7 million in goodwill.  The Information Statement explained that goodwill "was allocated from [CHS] to the Company's hospital operations reporting unit based on a relative fair value approach as of September 30, 2013 ([CHS]'s goodwill impairment testing date)."  The calculation of goodwill and the allocation from CHS was based on the stock price of CHS as of September 30, 2013, which was $41.50.

55.    On May 11, 2016, the Company issued a press release announcing its financial and operating results for the first quarter ended March 31, 2016.  In the press release, Quorum reaffirmed the Company's prior fiscal year 2016 financial guidance of $2.2 billion to $2.3 billion for net operating revenues and defendant Miller stated that Company's fiduciaries were "confident and optimistic about the long-term future" of Quorum.  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████.

---

[3] At this time, and up until April 29, 2016, Quorum was a wholly owned subsidiary of CHS.

56.     That same day, May 11, 2016, Quorum filed its Quarterly Report on Form 10-Q with the SEC, disclosing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 Form 10-Q").  For the quarter, Quorum reported a net loss of $5 million on revenue of $549.5 million, compared to net income of $6.2 million on revenue of $547.6 million for the same period in the prior year.  The Q1 2016 Form 10-Q also reported that Quorum's total assets exceeded $2.3 billion, which included $541.8 million in goodwill.  The Q1 2016 Form 10-Q stated:

> Goodwill is allocated to each identified reporting unit, which is defined as an operating segment or one level below the operating segment (referred to as a component of the entity). Management has determined that QHC's hospital operations and hospital management advisory and consulting services operations meet the criteria to be classified as reporting units. ***Goodwill related to QHC's hospital operations reporting unit was $508.5 million and $508.4 million as of March 31, 2016 and December 31, 2015, respectively. Goodwill related to QHC's hospital management advisory and consulting services reporting unit was $33.3 million at both March 31, 2016 and December 31, 2015.***

57.     The Q1 2016 Form 10-Q also explained the Company's procedures for testing goodwill for impairment and represented that the Company performed impairment testing in compliance with GAAP:

> ***Goodwill is evaluated for impairment at the same time every year and when an event occurs or circumstances change that, more likely than not, reduce the fair value of the reporting unit below its carrying value.***  There is a two-step method for determining goodwill impairment.  Step one is to compare the fair value of the reporting unit with the unit's carrying amount, including goodwill.  If this test indicates the fair value is less than the carrying value, then step two is required to compare the implied fair value of the reporting unit's goodwill with the carrying value of the reporting unit's goodwill.  ***The Company performed its last annual goodwill evaluation during the fourth quarter of 2015.***  No impairment was indicated by this evaluation.  The next annual goodwill evaluation will be performed during the fourth quarter of 2016.

58.     ████████████████████████████████████████████████

████████████████████████████████████████████.  *See* QHC-220-000002-4.

In addition, the Q1 2016 Form 10-Q contained signed certifications by defendants Miller and Culotta, pursuant to the Sarbanes-Oxley Act of 2002, stating that the report was accurate and disclosed any material changes in Quorum's internal control over financial reporting.

**B.     GAAP Provisions Applicable to Goodwill and Long-Lived Assets**

59.     GAAP requires companies to regularly review goodwill and long-lived assets for impairment to determine if their reported values are impaired (i.e., whether the values have declined).  In addition, GAAP requires companies test for impairment between required annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of that asset.

**1.     Testing Goodwill for Impairment**

60.     Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Accounting Standards Codification ("ASC") 805-10-05-4 "requires that a business combination be accounted for by applying … the acquisition method."  Under ASC 805-20-30-1, the acquisition method requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition.  ASC 805-10-20 provides that fair value is "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."  Under these provisions, the implied fair value of goodwill is "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities."  ASC 350-20-35-16.

61.     A reporting unit is defined as an operating segment of a company or one level below an operating segment.  ASC 350-20-20.  Quorum has two operating segments consisting of its hospital operations and its management advisory and consulting services business.  These operations are separate reporting units for purposes of goodwill impairment testing.

62.     ASC 350-20-35-2 defines an impairment as "the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value."  Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20.  Under these standards, goodwill must be tested annually, as well as, in any quarter where certain circumstances exist.  In particular, under ASC 350-20-35-3A, companies are required to test goodwill in any quarter when an assessment of "qualitative factors" determines "more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill."

63.     The goodwill impairment analysis requires companies test for impairment for any quarter when certain triggering events are present "that would more likely than not reduce the fair value of a reporting unit below its carrying amount."  ASC 350-20-35-30.  Among other things, triggering events include:

    a.      Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets.

    b.      Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development.

    c.      Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows.

    d.      Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods.

    e.      Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation.

f.   Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

g.   If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

These guidelines obligated Quorum to test for goodwill impairment if the totality of the events and circumstances described above, as applied to Quorum, made it more likely than not that the fair value of the reporting unit was less than the book value or carrying amount.

64.   Under these guidelines, "[t]he first step of the goodwill impairment test, used to identify potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill."  ASC 350-20-35-4.  ASC 350-20-35-11 describes step two of the analysis:  "If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess.  The loss recognized cannot exceed the carrying amount of goodwill."  If the implied goodwill is less than the carrying value of the goodwill, the company must immediately recognize a goodwill impairment charge.  ASC 350-20-35-2, 4, 8, 9, 14-17.

### 2.   Testing Long-Lived Assets for Impairment

65.   Similarly, long-lived assets should be tested for recoverability whenever events or changes in circumstances indicate that the carrying value of the long-lived asset may not be recoverable.  ASC 360-10-35-21.  Like goodwill, ASC 360-10-35-21 provides that long-lived assets that are being depreciated or amortized, are to be tested for impairment if impairment indicators are present, such as:

a.   A significant decrease in the market price of a long-lived asset (asset group).

b.      A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition.

c.      A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.

d.      An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group).

e.      A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group).

f.      A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term *more likely than not* refers to a level of likelihood that is more than 50 percent.

66.     Entities are responsible for routinely assessing whether impairment indicators are present and if impairment indicators are present or if other circumstances indicate that the carrying amount of the long-lived asset might not be recoverable, the company must apply a two-part test to determine whether the long-lived assets are impaired.   Under the first step, the company must determine whether the carrying amount of the long-lived asset (or asset group) exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset.   ASC 360-10-35-17.   If the undiscounted cash flows are less than the long-lived asset's carrying amount, under step two, the company must then determine the amount by which the carrying amount exceeds the expected discounted cash flows.   ASC 360-10-35-17, 18.  An impairment loss should be recognized "if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value."  ASC 360-10-35-17.

**C.** **The Company Fails to Test for Impairment Despite Red Flags Indicating Quorum's Goodwill and Long-Lived Assets Were Impaired as of the Date of the Spin-Off**

67. As detailed further herein, a number of important indicators existed prior to the spin-off, and in the months thereafter, alerting the Individual Defendants that Quorum's goodwill and long-lived assets were severely impaired. These red flags include: (i) the sustained and significant decreases in share prices for both CHS and Quorum; (ii) the dramatic decline in overall performance for CHS and Quorum; (iii) the vivid underperformance of Quorum's hospitals; (iv) the increased competition Quorum's hospitals faced from larger hospitals; (v) deterioration throughout the entire healthcare industry; and (vi) Quorum's increasing cost factors.

**1.** **A Number of Red Flags Indicate the Company's Goodwill and Long-Lived Assets Are Impaired**

68. By first quarter 2016, the overall financial performance of both Quorum and CHS was severely deteriorating as costs increased and hospital admissions declined. The decline in overall financial performance along with increasing cost factors had a negative effect on future earnings and future cash flows in the hospitals that were spun off from CHS beginning by at least March 31, 2016.

**a.** **Quorum's Underperforming Hospitals Should Have Caused an Impairment Review**

69. The hospitals chosen to be spun off into Quorum were some of CHS's worst performing hospitals. In fact, of the thirty-eight hospitals that were spun off into Quorum, at least twelve of the hospitals had negative operating margins in the double-digit range.

70. ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

("EBITDA"). ████████████████████████████████████████

." QHC-220-001285.

. QHC-220-000096.

71.

. *See* QHC-220-000145.



72. ███████████████████████████████████████████

████████████████████████████████████████████████

███████████████ *See* QHC-220-001286. ███████████████

████████████████████████████████████████ █

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████." QHC-220-000634.

73. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████.

   **b.      Cost Factors Having a Negative Effect on the Company's Earnings and Cash Flows Should Have Caused an Impairment Review**

74.      Increasing costs only exacerbated the Company's already deteriorating financial condition.  As an initial matter, Quorum was forced to incur certain stand-alone costs that it would not have incurred had it still been part of CHS.  When Quorum was part of CHS, costs such as certain salaries, benefits, tax, treasury, audit, risk management, legal, investor relations,

human resources, and certain service agreements were all paid directly by CHS. After the spin-off, Quorum would be forced to pay these expenses.

75. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████  ████████████████████

███████████████████████████████████████████████.

QHC-220-001283.

76. In addition, there was an increase in the costs of the Company's Transition Services Agreements ("TSAs") with CHS. TSA costs relate to certain agreements that Quorum had with CHS to provide administrative services for information technology, payroll processing, collections, eligibility screening service, and revenue cycle management for hospitals and physician practices. The costs of these agreements were running at a $9-$10 million annualized higher cost than the 2015 direct allocations.

77. The increase in cost factors had a negative effect on earnings and future cash flows, and should have caused the Company to test its goodwill for impairment.

       **c.**     **The Dramatic Decline in Quorum and CHS's Overall Financial Performance Should Have Caused an Impairment Review**

78. As Quorum's costs increased and its hospitals continued to underperform, the Company's overall financial performance deteriorated. CHS, likewise, continued on a downward spiral into the first quarter of 2016. The dramatic decline in Quorum and CHS's overall financial performance indicated that the Company's goodwill and long-lived assets were likely impaired, and should have caused the Company to perform impairment testing.

79.     In the quarters leading up to the spin-off, CHS experienced significant declines in year-over-year results, and drastically missed their own projections as well as analyst expectations.  Admissions at CHS declined 1.9%, 3.6%, and 2.6%, compared to the same periods in the prior year, and same-store admissions decreased 2.1%, 3.4%, and 2%.  While admissions steadily declined, CHS's income from operations quickly deteriorated.  For the third and fourth quarters of 2015 and the first quarter of 2016, CHS's income from operations declined by 9%, 157%, and 87%, respectively, compared to the same periods in the prior year and adjusted EBITDA declined 11.9%, 32.9%, and 11.5% compared to the same periods in the prior year. These disappointing results missed consensus estimates by 37%, 31%, and 10.2% in third quarter 2015, fourth quarter 2015, and first quarter 2016, respectively.  During CHS's earnings calls, Wayne T. Smith, CHS's Chief Executive Officer, repeatedly stated that management was "disappointed" in each quarter's results.

80.     The disappointing results continued into the first quarter of 2016.  In a May 3, 2016 report titled "Larger Miss on Margin Pressure, with Significant Cut to Guidance," a Barclays analyst described the challenges facing CHS and observed that the quarter was even worse than prior quarters:

> Over the past year, we have written numerous times about the challenges facing Community Health Systems, and *the first quarter of 2016 is once again a continuation of those negative trends. In fact, we view this quarter as somewhat worse than other recent earnings misses* as the pressure came more on margins and less on volumes. This was the third consecutive quarter that Community has missed the consensus by more than 10%. The quarter was marked by volumes and payor mix that were actually in line with our estimates and all of the pressure coming from various cost items....  As we look forward, *Community cut its guidance for operating earnings*.

81.     Unfortunately, Quorum's own financial performance was not any better. Financial information concerning Quorum's financial results disclosed by CHS prior to the spin-

off revealed that the hospitals that made up Quorum were struggling even more than CHS as a whole. For fiscal year 2015, the Company recorded a net loss of $5.331 million, compared to net income of $7.8 million in 2014. Adjusted EBITDA similarly declined from $264.8 million in 2014 to $263.7 million in 2015.

82. Quorum's disappointing financial results for the first quarter ended March 31, 2016, confirmed its troubled state. For the quarter, the Company experienced a net operating loss of $5 million compared to net income of $6.2 million for the same period in the prior year. Likewise, income from operations declined 38% from $34.3 million in the first quarter of 2015 to $21.1 million in first quarter 2016 and adjusted EBITDA declined approximately 15% to $56 million for the first quarter 2016 from $66 million for the same quarter in 2015.

> **d.  The Sustained and Significant Decrease in Quorum and CHS's Share Price and Market Capitalization Should Have Caused an Impairment Review**

83. From June 26, 2015 through the spin-off of Quorum on April 29, 2016, as CHS's financial performance worsened, CHS's stock price steadily fell. Specifically, between this time, CHS's stock price fell $49.17 per share, or nearly 77%, from $64.04 per share on June 26, 2015 to $14.87 per share on May 3, 2016, eliminating more than $5.8 billion in market capitalization. As the Company acknowledges in the Form 10, because Quorum's goodwill was merely a portion of CHS's goodwill, these indications of impairment applied equally to Quorum. The Information Statement in the Form 10 states: "The determination of fair value in step one of our goodwill impairment analysis is based on an estimate of fair value for each reporting unit utilizing known and estimated inputs at the evaluation date." The first listed input was "the most recent price of CHS' common stock."

84. To make matters worse, since the hospitals that made up Quorum were struggling even more than the CHS hospitals as a whole, the Company's stock price continued the steep

slide after the spin-off. In fact, between May 2, 2016, when the Company's stock began trading on the NYSE, and May 11, 2016, the day the Company filed its first quarter results with the SEC, the Company's stock price fell $3.15 per share, or 24%, from $13.08 per share on May 2, 2016 to $9.93 per share on May 11, 2016. This decline eliminated more than $92.8 million of the Company's market capitalization.

85. Quorum and CHS's combined market capitalization loss of nearly $5.9 billion was a key indicator that Quorum's goodwill was impaired. The Office of the Chief Accountant for the SEC explained in December of 2008 at a conference on SEC and Public Company Accounting Oversight Board Developments, recent stock price declines are significant to the goodwill analysis:

> [I]t would not be reasonable for a registrant to simply ignore recent declines in their stock price, as the declines are likely indicative of factors the registrant should consider in their determination of fair value, such as a more than temporary repricing of the risk inherent in any company's equity that results in a higher required rate of return or a decline in the market's estimated future cash flows of the company.

Statutory accounting provisions similarly confirm that "a sustained decrease in share price (consider[ed] in both absolute terms and relative to peers)" can be a triggering event that requires testing for goodwill impairment. *See* ASC 350-20-35-3C(g). While these provisions do not specify how long a period of time a company's stock price must decline to be characterized as a "sustained decrease," at least one other publicly-traded company found declining stock prices over a period of as little as seven days to constitute a "sustained" decline.[4]

---

[4] Sientra, Inc. cited "a significant decline in its common stock price" as one indicator of goodwill impairment for its quarter ended September 30, 2015. The "sustained" decline compromised seven days, from September 24, 2015 to September 30, 2015.

86.     The decline in stock prices of CHS and Quorum between June 26, 2015 and May 11, 2016, when Quorum filed its Q1 2016 Form 10-Q, and the resulting market capitalization losses, also indicated that the carrying amount of the Company's long-lived assets may not have been recoverable.  The drop in CHS and Quorum's share price was an indication that Quorum's future cash flows and earnings were going to be negatively affected and the dramatic market capitalization decline clearly qualifies as an "event or change in circumstances" indicating that the carrying value may not be recoverable.  ASC 360-10-25-21.

87.     Furthermore, when the Company belatedly tested for goodwill and long-lived asset impairment, it was the significant stock price decline and corresponding decline in market capitalization they cited as the impetus for testing.   These indicators of impairment, however, were manifestly present during first quarter 2016, but notably absent in the second quarter of 2016.  In fact, Quorum's stock price actually increased between May 9, 2016, the day before Quorum announced its financial results for the first quarter of 2016, and August 10, 2016, when the Company announced the goodwill impairment.   Accordingly, this impairment indicator requiring Quorum conduct impairment testing existed prior to the filing of the Company's first quarter 2016 financial results, not after.

88.



.

QHC-220-000634.

89. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

**2. The Board Was Fully Aware of These Indicators of Impairment Before Filing Its First Quarter 2016 Financial Results**

90. The Individual Defendants were well aware of Quorum's deteriorating financial performance, severely underperforming hospitals, increasing costs, and falling stock prices, long before the Company belatedly tested its goodwill and long-lived assets for impairment. As an initial matter, the Individual Defendants were intimately familiar with the details of CHS's business, and therefore also Quorum's business. In fact, four of the Individual Defendants—defendants Miller, Culotta, Paul, and Hussey—were former CHS executives: (i) defendant Miller was President of Division V Operations at CHS from July 2007 until at least April 2016; (ii) defendant Culotta was Vice President of Investor Relations at CHS from 2013 until at least October 2015; (iii) defendant Paul was Senior Vice President at CHS from 2007 to 2014; and (iv) defendant Hussey was Division VI President of Operations from April 2014 to December

2015, Division IV President of Operations from 2007 to at least April 2013; Group Senior Vice President from January 2004 to 2007, Group Vice President from January 2003 to January 2004, and Group Assistant Vice President from June 2001 to January 2003. Given their long-standing executive positions at CHS, these defendants could not have been unaware of CHS's struggling hospitals and deteriorating financial performance, and that Quorum's hospitals were not performing any better.



91.

92.

QHC-220-000002.

. *See* QHC-220-000003; QHC-220-000004.



QHC-220-000003; QHC-220-000004.

93.

. *See* QHC-220-000003; QHC-220-000004.

*Id.*

94.

QHC-220-001285; QHC-220-001286.



QHC-220-001286.

95.

QHC-220-001285.

96.     Lastly, the Individual Defendants could not have been unaware of the additional costs the Company would incur after the spin-off.   One of the key metrics in analyzing a potential spin-off is the stand alone operating costs.   Defendants Culotta, Miller, Hussey, and Paul, as former CHS executives either knew or were reckless in not knowing that Quorum would be forced to incur these stand-alone operating costs after the spin-off.   Furthermore, unlike expenses entirely outside of defendants' control, expenses of this type would have been generally known by the Individual Defendants at the time of the spin-off.   For example, the Individual Defendants knew that medical specialist costs would be incurred because CHS itself, in late 2015, had negotiated these contracts.   Moreover, in the 1Q 2016 Form 10-Q the Company acknowledged that it was subject to additional costs previously incurred by CHS.   The 1Q 2016 Form 10-Q stated:

*Stand-Alone Public Company Costs*

Prior to the Spin-off, Quorum Health Corporation had no operations other than those related to the preparation to receive the assets and liabilities of Quorum Health from CHS. Following the Spin-off, Quorum Health Corporation became an independent public company.

Upon the Spin-off, QHC assumed responsibility for all of its stand-alone public company costs, including the costs of certain services provided by CHS prior to the Spin-off. ***The estimated expenses associated with being an independent, public company*** include costs associated with corporate administrative services such as tax, treasury, audit, risk management, legal, investor relations and human resources and ***are estimated to be approximately $3 million higher annually than amounts previously allocated to QHC by CHS. Additionally, costs and expenses associated with the transition services agreements are estimated to be approximately $5 million higher annually than amounts previously allocated to QHC by CHS.***

97. 



QHC-220-000003; QHC-220-000004.

98.     Notwithstanding the sustained and significant decrease in the Company's stock price, dramatic decline in Quorum's overall financial performance, vivid underperformance of Quorum's hospitals, and increasing costs, the Board and its committee members failed to take any action to determine whether Quorum's assets were impaired.  Stated differently, the Board turned a blind eye to a number of red flags, clearly indicating that Quorum's assets were severely impaired.

### 3.     The Individual Defendants' Failure to Timely Test for and Recognize Impairments Violates GAAP

99.     As a result of the Individual Defendants' failure to test the Company's goodwill and long-lived assets for impairment despite these red flags, Quorum improperly delayed recognizing hundreds of millions of dollars in impairments, in violation of GAAP.

100.    Had the Individual Defendants tested goodwill for impairment before filing Quorum's first quarter 2016 financial statements, they would have learned that Quorum's goodwill was impaired at the time it was initially allocated to the Company from CHS in connection with the spin-off.  Since there was no reasonable basis to believe that the fair value exceeded the carrying value of goodwill and that the goodwill was supported by sufficient future cash flows, Quorum would have failed both steps of the goodwill impairment test and been forced to recognize hundreds of millions of dollars in impairments on its first quarter 2016 financial statements.  By failing to test for impairment, the Individual Defendants improperly delayed recognizing this enormous impairment.  As a result, the Company's Q1 2016 Form 10-Q materially overstated Quorum's assets while understating its expenses.

101.    Likewise, the Individual Defendants violated GAAP by failing to test its long-lived assets for impairment before filing its financial results for the first quarter of 2016.  Given the presence of the aforementioned indicators of impairment, in particular, the Company's intent to divest a number of its hospitals, ASC 360 required the Company perform a recoverability test by comparing the sum of the estimated undiscounted future cash flows attributable to Quorum's hospitals to their carrying amount.  By not performing a cash flow analysis before filing its Q1 2016 Form 10-Q, the Individual Defendants failed to comply with ASC 360.  Like with its goodwill, had the Individual Defendants performed this cash flow analysis, it would have been forced to record a significant impairment charge for the first quarter 2016.

**4.    The Individual Defendants' Failure to Timely Test for and Recognize Impairments Results in SEC Violations**

102.    By failing to record goodwill impairment in a timely manner the Individual Defendants caused Quorum to violate SEC regulations.  In particular, the Company violated

section 13(b)(2) of the Exchange Act titled "Periodical and Other Reports," which requires Quorum maintain accurate books and records and implement internal controls to ensure transactions are accurately recorded. Section 13(b)(2) of the Exchange Act states:

> Every issuer which has a class of securities registered pursuant to section 12 of this title and every issuer which is required to file reports pursuant to section 15(d) of this title shall:
>
> > (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
> >
> > (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
> >
> > > (i)    transactions are executed in accordance with management's general or specific authorization;
> > >
> > > (ii)    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements….

103.    By failing to record goodwill impairment on its Q1 2016 Form 10-Q, the Company materially understated its expenses and overstated its profits. The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Quorum's profitability and future liquidity, and, therefore were required to be disclosed in the Q1 2016 Form 10-Q.

## THE INDIVIDUAL DEFENDANTS FAILED TO TAKE ANY ACTION TO ENSURE THE ACCURACY OF QUORUM'S FINANCIAL REPORTS

104.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See*

QHC-220-000634. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█████████████████████████████████████████████

█████████████████████

105.  █████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████  █████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████  *See* QHC-220-000634.  ███████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████



106.  █████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████  *See*

*id.* █████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ *Id.*

107.     By turning a blind eye to the Company's woefully inadequate internal controls, the Individual Defendants caused the Company to deceive investors with misleading financial statements that significantly overstated the value of the Company's assets.

## THE TRUTH EMERGES

108.     The truth about the Company's financial condition began to emerge on August 10, 2016, after the market closed, when Quorum filed its Q2 2016 Form 10-Q.  The Q2 2016 Form 10-Q revealed noncash impairment charges of $250.4 million for the quarter, which included $45.4 million to reduce certain long-lived asset values, $5 million in goodwill based on management's decision to divest certain hospitals, and $200 million related to the carryover allocation of goodwill at the time of the spin-off.  As a result of these impairment charges, the Company reported a substantial operating loss of $259.3 million, compared to the $27.5 million of operating income the Company reported for the same period in the prior year.  In a press release issued that same day, the Company disclosed that it had lowered its 2016 guidance for net operating revenues to range from $2.15 billion to $2.20 billion from its previous range of $2.2 billion to $2.3 billion.

109.     On this news, shares of Quorum stock plummeted nearly 50%, from $10.02 per share on August 10, 2016, to $5.03 per share on August 11, 2016, wiping out more than $147 million in market capitalization in a single day.

110.     The following day, August 11, 2016, after the markets closed, Quorum hosted an earnings conference call with analysts and investors to discuss these unexpected and

disappointing results. During the call, defendant Miller blamed these poor results on "a lack of focus" leading up to the spin-off, stating:

> This quarter was not at all what we had in mind for our first quarter as a public company.… As you know, we were not set up as a separate entity, and thus had no real hands-on with the majority of these facilities and [Quorum Health Resources] prior to that time. With the facilities from all six divisions of CHS, it's only natural to expect **there was a lack of focus on many of these matters leading up to the spin**.

111. Also during the call, defendant Culotta acknowledged that Quorum had overstated its goodwill both at the time of the spin-off and after the spin-off. Despite the Company's prior representations, defendant Culotta admitted that when looking at the Company's market value prior to and after the spin-off, as well as recent trends, "it was apparent that there were indicators of impairment." Defendant Culotta stated:

> …The former Parent used a stock price of $41.50 at September 30, 2013, and multiplied times the number of shares, and then multiplied by 1.25% to give a control premium. They then added the debt less cash. They then took the trailing 12-months adjusted EBITDA of the hospitals to be spun out and gave it a 7.5 multiple; and then compared that value to the other value and it represented about 10%.

> The 10% was used to allocate goodwill: 10% to [Quorum] and 90% to CHS. **So when you take a look at our market value through our equity both at spin and subsequent to the spin and recent trends, it was apparent that there were indicators of impairment.**

> All testing calculations we did average to the $200 million amount.

112. The full extent of the wrongdoing at Quorum however, did not emerge until June 2018, when plaintiff received certain of Quorum's internal books and records in response to his Section 220 Demand. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ Because the Individual

Defendants' complete lack of oversight over Quorum was never made public, in the absence of

these documents, plaintiff's counsel could not have discovered the wrongdoing detailed herein.

## DAMAGES TO QUORUM

113.     As a result of the Individual Defendants' improprieties, Quorum disseminated

improper, public statements concerning the Company's operating performance, value of its

assets, and the adequacy of the Company's internal controls over its financial reporting.  These

improper statements have devastated Quorum's credibility as reflected by the Company's ***$147

million, or nearly 50%, market capitalization loss*** when the truth emerged.

114.     The Individual Defendants' improper course of conduct has also subjected the

Company to potentially hundreds of millions of dollars in damages in connection with the

Securities Class Actions.  The Securities Class Actions allege that the goodwill and long-lived

assets of Quorum were impaired on the date of the spin-off, but Quorum and CHS failed to

disclose those impairments.  The plaintiffs thus reason that the value of Quorum's assets was

materially overstated, and as a result, the prices of Quorum stock were artificially inflated.  The

Company's motion to dismiss the federal securities class action was denied by Chief Judge

Waverly D. Crenshaw on April 20, 2018.  Likewise, the Company's motion to dismiss the

securities class action filed in the Circuit Court of Williamson County, Tennessee, was denied by

Judge Joseph A. Woodruff, on May 11, 2018.  The Company will now be forced to bear the cost

of investigating, defending, and potentially settling or paying an adverse judgment for the

Securities Class Actions.

115.     Quorum's improper accounting practices and gross failures to timely address,

remedy, or even disclose such practices also severely damaged its reputation within the business

community and in the capital markets. In addition to price, Quorum's current and potential investors consider a company's trustworthiness, stability, and ability to accurately value its business prospects. Investors are less likely to invest in companies that disseminate improper statements, fail to comply with their own internal protocols and external regulations, and are uncertain about their own financial conditions. Accordingly, Quorum's ability to attract customers and investors is now impaired. In addition, Quorum's ability to raise equity capital or debt on favorable terms in the future is now impaired. The Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

116. Further, as a direct and proximate result of the Individual Defendants' actions, Quorum has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in defending and paying any settlement in the Securities Class Actions for violations of federal and state securities laws;

(b)     costs incurred to investigate wrongdoing;

(c)     costs incurred in implementing adequate internal controls over financial reporting; and

(d)     costs incurred from the substantial compensation and benefits paid to the defendants who have breached their duties to Quorum.

117. Unfortunately, as a result of the Release, Quorum is unable to go after CHS, or any CHS employee for their breaches of fiduciary duty or other wrongful acts for which Quorum is now paying.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff brings this action derivatively in the right and for the benefit of Quorum to redress injuries suffered, and to be suffered, by Quorum as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Quorum is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

119.    Plaintiff will adequately and fairly represent the interests of Quorum in enforcing and prosecuting its rights.

120.    Plaintiff was a stockholder of Quorum at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Quorum stockholder.

121.    The current Board of Quorum consists of the following nine individuals: defendants Breedlove, Hastings, Paul, and Van Horn, and non-defendants Robert H. Fish ("Fish"), Jon H. Kaplan ("Kaplan"), William Paul Rutledge ("Rutledge"), Terry A. Rappuhn ("Rappuhn"), and Alice D. Schroeder ("Schroeder").  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

122.    As an initial matter, for purposes of demand futility, the Court should not take into consideration non-defendants Kaplan, Rutledge, and Fish.  In September 2018, plaintiff's counsel telephoned counsel for Quorum to discuss the possibility of plaintiff filing a derivative action in the U.S. District Court for the Middle District of Tennessee, in light of the Company's exclusive forum provision.  Plaintiff's counsel noted that its opinion that Quorum could not legally control where stockholders could file a derivative action that included claims for securities law violations, but in order to avoid needless briefing, asked whether Quorum would

agree to plaintiff filing a derivative action in the U.S. District Court for the Middle District of Tennessee. While Quorum's counsel told plaintiff's counsel they would consider the request, counsel for the Company has yet to respond to this request. However, immediately after learning of plaintiff's intent to file a derivative action, the Board appointed three new members to the Board. The Board's action is an attempt to prevent our client from filing a derivative action by changing the Board composition. In fact, the appointment of the additional directors was so rushed, that Kaplan and Rutledge had yet to even enter into an indemnification agreement at the time of the Company's announcement of their appointment. In light of the foregoing, the Court should not consider non-defendants Kaplan, Rutledge, and Fish for purposes of determining whether the Board could impartially consider a demand to commence and vigorously prosecute this action.

123. In addition, the rushed appointment of the additional Board members in order to change the Board composition in an attempt to prevent Plaintiff from bringing this action demonstrates that defendants Breedlove, Hastings, Paul, and Van Horn and non-defendants Schroeder and Rappuhn knew that a demand upon them would be futile. The Board could not be expanded without the current Board members' approval. Because six of the nine members of the Board have effectively admitted that they cannot impartially or disinterestedly consider a demand, demand upon the Board is excused.

**Demand Is Excused Because Defendants Breedlove, Hastings, Paul, and Van Horn Face a Substantial Likelihood of Liability for Their Misconduct**

124. As alleged above, four of the nine current Board members, including defendants Breedlove, Hastings, Paul, and Van Horn breached their fiduciary duties by failing to ensure the Company maintained adequate internal controls over financial reporting. In fact, Quorum's internal controls were so deficient that the Company did not even have an accounting department when it began filings its financial reports with the SEC. As a result of these breaches, Quorum was not properly accounting for its assets, and was ultimately forced to recognize hundreds of

millions of dollars in impairment charges. Accordingly, defendants Breedlove, Hastings, Paul, and Van Horn breached their fiduciary duties of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Breedlove, Hastings, Paul, and Van Horn face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

125. Defendants Breedlove, Hastings, Paul, and Van Horn further breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding: (i) the accrual of millions of dollars in unreported impairment charges for Quorum; (ii) the adequacy of the Company's internal controls; and (iii) the Company's artificially overstated value as a result of defendants' wrongful conduct. These statements were improper because they knowingly or recklessly misstated and/or omitted material, adverse facts concerning the Company's financial performance and condition, as well as the effectiveness of the Company's internal controls and disclosure controls and procedures. Accordingly, the majority of the Board faces a substantial likelihood of liability for their breaches of fiduciary duties, making any demand upon them futile.

126. Two of the nine current Board members, including defendants Breedlove and Van Horn, as members of the Audit and Compliance Committee, caused or allowed Quorum to operate with inadequate internal controls over financial reporting. As members of the Audit and Compliance Committee, these defendants also reviewed and approved the improper statements and earnings guidance. The Audit and Compliance Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements and overseeing "the integrity of the Company's financial statements" as well as "the performance of the Company's internal audit function." Thus, the Audit and Compliance Committee Defendants

were responsible for knowingly or recklessly failing to fulfill their oversight duties, and for allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit and Compliance Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit and Compliance Committee Defendants caused these improper statements.

127. Any suit by the current directors of Quorum to remedy these wrongs would expose defendants Miller and Culotta, and Quorum to liability for violations of federal and state securities laws in the Securities Class Actions, and would result in civil actions being filed against one or more of the other Individual Defendants. The federal securities class action alleges violations of sections 10(b) and 20(a) of the Exchange Act and the securities class action filed in the Circuit Court of Williamson County, Tennessee, alleges violations of Tennessee's state blue sky laws. If the Board elects for the Company to press forward with its right of action against defendants Miller and Culotta in this action, then Quorum's efforts would compromise its defense of the Securities Class Actions. Accordingly, demand on the Board is excused.

**Demand Is Excused as to Defendant Paul for Additional Reasons**

128. Director Defendant Paul is incapable of impartially considering a demand to commence and vigorously prosecute this action. If this litigation proceeds, there is a substantial likelihood that the Release will be declared void and defendant Paul will no longer be insulated from liability for her wrongdoing arising in connection with the spin-off of Quorum. Given the significant potential liability defendant Paul faces if the Release is declared void, she lacks the requisite level of independence necessary to weight the merits of this litigation.

129. In addition, Director Defendant Paul is incapable of impartially considering a demand to commence and vigorously prosecute this action due to her long-standing overlapping business relationships with defendants Culotta, Hussey, and Miller. Prior to joining Quorum,

defendants Paul, Culotta, Hussey, and Miller all served in various capacities for CHS. Defendant Culotta served CHS in several positions from 2013 to at least November 2015, most recently serving as the Vice President of Investor Relations. Defendant Hussey served CHS in several positions from 2001 to at least December 2015, including President of Division VI Operations. Defendant Miller joined CHS in connection with the acquisition of Trial Hospitals Inc. in July 2007 and served as CHS's President of Division V Operations from July 2007 to at least April 2016.

130.    There is a reasonable doubt that defendant Paul would vote to initiate litigation against defendants Culotta, Hussey, and Miller due to these long-standing business relationships. As a result of these long-standing and extensive professional entanglements, defendant Paul is incapable of impartially considering a demand to commence and vigorously prosecute this action. Demand is therefore futile as to defendant Paul.

**Demand Is Excused as to Non-defendants Kaplan, Rappuhn, and Schroeder for Additional Reasons**

131.    Director non-defendants Kaplan, Rappuhn, and Schroeder are incapable of impartially considering a demand to commence and vigorously prosecute this action due to their long-standing overlapping business relationships with defendant Culotta. Non-defendants Schroeder and Rappuhn and defendant Culotta were concurrently employed at the accounting firm Ernst & Young LLP ("EY") from 1980 to 1991. In addition, defendant Culotta and non-defendants Rappuhn and Kaplan were concurrently employed at EY from 1990 to 2001. While employed at EY, non-defendant Rappuhn served a wide range of healthcare clients.

132.    There is a reasonable doubt that non-defendants Kaplan, Rappuhn, and Schroeder would vote to initiate litigation against defendant Culotta due to these long-standing business relationships. As a result of these long-standing professional entanglements, non-defendants

Kaplan, Rappuhn, and Schroeder are incapable of impartially considering a demand to commence and vigorously prosecute this action. Demand is therefore futile as to non-defendants Kaplan, Rappuhn, and Schroeder.

**Demand Is Excused as to Non-defendant Fish Because He Lacks Independence**

133. Non-defendant Fish has been Chief Executive Officer of Quorum since September 2018. Non-defendant Fish is not an independent director because non-defendant Fish's principal professional occupation is his employment with Quorum, pursuant to which he has received and continues to receive substantial monetary compensation. In addition, non-defendant Fish's reputation is inextricably linked to his role at Quorum. Accordingly, non-defendant Fish lacks independence from defendants Breedlove, Hastings, Paul, and Van Horn, and non-defendants Kaplan, Rutledge, Rappuhn, and Schroeder due to his interest in maintaining his executive position at Quorum. Accordingly, non-defendant Fish is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to non-defendant Fish.

134. Plaintiff has not made any demand on the other stockholders of Quorum to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Quorum is a publicly held company with over 30.8 million shares outstanding and thousands of stockholders as of August 6, 2018;

(b)     making demand on such a large number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of Company stockholders; and

(c)    making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against Defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings for Violation of Section 29(b) of the Exchange Act

135.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

136.    As a result of their conduct, as alleged herein, defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings violated section 10(b) of the Exchange Act during the time that Quorum entered into the Separation Agreement with CHS.

137.    The Separation Agreement memorialized the assets and liabilities which would transfer from CHS to Quorum.  In addition, the Separation Agreement released CHS's directors, officers, agents, and employees, from any liabilities existing or arising "in connection with the implementation of the Separation and the Distribution" and "from actions, inactions, events, omissions, conditions, facts or circumstances occurring or existing prior to the Effective Time … to the extent relating to, arising out of resulting from the QHC Business, the QHC Assets or the QHC Liabilities."   While negotiating and/or implementing this contract, defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings disseminated or approved false and misleading public statements about Quorum, as alleged herein.

138.    Section 29(b) of the Exchange Act provides equitable remedies that include, among other things, provisions allowing for the voiding of contracts where the performance of the contract involved violation of any provision of the Exchange Act.

139. Defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings violated provisions of the Exchange Act while performing their duties arising under the Separation Agreement Quorum entered into with CHS.

140. Quorum was and is an innocent party with respect to defendants' Exchange Act violations.

141. Plaintiff, on behalf of Quorum, seeks rescission of the Separation Agreement to the extent it releases any of the Individual Defendants from any liability due to defendants' violations of the Exchange Act while performing their obligations under the Separation Agreement.

142. Plaintiff seeks only declaratory, injunctive, and equitable relief in this claim.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

143. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144. As alleged in detail herein, the Individual Defendants by reason of their positions as officers and directors of Quorum and because of their ability to control the business and corporate affairs of Quorum, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Quorum in a fair, just, honest, and equitable manner.

145. Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein. The Individual Defendants repeatedly encouraged and/or acquiesced to unlawful and unethical behavior throughout the Company's business operations.

146.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing:  (i) there were a number of indicators of impairment prior to the spin-off of Quorum and impairment testing should have been conducted before the Company filed its first quarter 2016 financial results; (ii) Quorum's goodwill was impaired by $205 million; (iii) the Company's long-lived assets were impaired by $45.4 million; (iv) as a result of the failure to record impairments on a timely basis, Quorum's long-lived assets and goodwill were significantly overstated; and (v) Quorum's internal controls over financial reporting were severely deficient.  Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

147.     The Director Defendants, as directors of the Company, owed Quorum the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.   The Director Defendants knew or were reckless in not knowing that: (i) there were a number of indicators of impairment prior to the spin-off of Quorum and impairment testing should have been conducted before the Company filed its first quarter 2016 financial results; (ii) Quorum's goodwill was impaired by $205 million; (iii) the Company's long-lived assets were impaired by $45.4 million; (iv) as a result of the failure to record impairments on a timely basis, Quorum's long-lived assets and goodwill were significantly overstated; and (v) Quorum's internal controls over financial reporting were severely deficient.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

148.     The Audit and Compliance Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly failing to fulfill their oversight duties and for allowing the

improper statements described herein which were made during their tenure on the Audit and Compliance Committee. The Audit and Compliance Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit and Compliance Committee Charter in effect at the time.

149.     Furthermore, defendants Culotta and Miller breached their fiduciary duties by approving the Separation Agreement which contained the Release for all of CHS's directors, officers, and employees from any liability for the wrongdoing they caused, including defendants Culotta, Miller, Hussey, and Paul. In approving the Separation Agreement defendants Culotta and Miller deprived Quorum of a substantial asset, Quorum's claims against CHS and certain of its officers and directors. In giving up these valuable claims for no consideration, defendants Culotta and Miller breached their fiduciary duties.

150.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Quorum has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

151.     Plaintiff, on behalf of Quorum, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

152.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.     As a result of the Individual Defendants' failure to test for goodwill and long-lived assets impairment, the Individual Defendants have caused Quorum to incur substantial costs. In particular, as a direct result of this failure, Quorum was forced to report a $250.4 million impairment charge.

154.     In addition, as a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Quorum is subject to the Securities Class Actions.  The Individual Defendants have caused Quorum to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

155.     Further, the Individual Defendants have caused Quorum to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

156.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

157.     Plaintiff, on behalf of Quorum, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

158.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Quorum.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Quorum.

160.     Plaintiff, as a stockholder and representative of Quorum, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

161.    Plaintiff, on behalf of Quorum, has no adequate remedy at law.

## COUNT V

**Against Defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn,
Gracey, and Hastings for Indemnification and Contribution**

162.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

163.    As a result of their conduct, as alleged herein, defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings violated section 10(b) of the Exchange Act.

164.    The conduct of the Individual Defendants described above has exposed Quorum to significant liability under various federal and state laws by their disloyal acts.

165.    Quorum is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

166.    In particular, as a direct result of defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings section 10(b) violations, the Company is now the subject of the Securities Class Actions.  The federal securities class action, filed in the U.S. District Court for the Middle District of Tennessee on behalf of investors who purchased Quorum's shares, brings claims against Quorum and defendants Miller and Culotta in connection with the Company's improper statements, including causes of action under sections 10(b) and 20(a) of the Exchange Act.  On April 20, 2018, Chief Judge Waverly D. Crenshaw denied the defendants' motion to dismiss this lawsuit.

167.    The state securities class action, filed in the Circuit Court of Williamson County, Tennessee, brings similar claims against Quorum and defendants Miller and Culotta under

Tennessee's blue sky laws. On May 11, 2018, Judge Joseph A. Woodruff denied the defendants' motion to dismiss this lawsuit.

168. Defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings have caused Quorum to suffer substantial harm through their disloyal acts. The Company has expended and will continue to expend significant sums of money in defending the Company and defendants Miller and Culotta in the Securities Class Actions. Because the claims brought in the Securities Class Actions have been upheld against motions to dismiss, the Company also faces a substantial threat of incurring potentially hundreds of millions of dollars in costs, expenses, and damages arising from the Securities Class Actions. These costs, expenses, and damages include not only potentially hundreds of millions of dollars to settle or satisfy an adverse judgment, but also millions of dollars in future costs related to the Company's defense.

169. Quorum is entitled to contribution and indemnification from defendants Miller, Culotta, Paul, Feinstein, Breedlove, Van Horn, Gracey, and Hastings in connection with all such claims that have been, are, or may be asserted against Quorum by virtue of the Securities Class Actions.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Quorum, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Ordering rescission of the Separation Agreement to the extent it releases CHS and its directors, officers, and employees from liability arising in connection with the spin-off of Quorum;

C.    Directing Quorum to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Quorum and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen the Company's internal controls over financial reporting;

2.    a proposal to strengthen the Company's disclosure controls to ensure material information is adequately and timely disclosed to the SEC and public;

3.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.    a proposal to terminate Deloitte & Touche, LLP as the Company's auditor; and

5.    a provision to permit the stockholders of Quorum to nominate at least three candidates for election to the Board;

D.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Quorum has an effective remedy;

E.    Awarding to Quorum restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues so triable.

Dated: September 17, 2018

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD
JERRY E. MARTIN

*s/ Christopher M. Wood*
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 244-2203
Facsimile: (615) 252-3798
E-mail: cwood@rgrdlaw.com
        jmartin@rgrdlaw.com

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
ASHLEY R. RIFKIN
STEVEN R. WEDEKING
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        csmith@robbinsarroyo.com
        arifkin@robbinsarroyo.com
        swedeking@robbinsarroyo.com

ROBBINS GELLER RUDMAN & DOWD LLP
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
E-mail: bennyg@rgrdlaw.com
        eluedeke@rgrdlaw.com

Attorneys for Plaintiff

## VERIFICATION

I, Harvey Horwitz, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: 09/11/2018

HARVEY HORWITZ